IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 7, 2002 Session

## DISCOUNT COMMUNICATIONS, INC. v. BELLSOUTH TELECOMMUNICATIONS, INC.

**Appeal from the Tennessee Regulatory Authority**
**No. 00-00230     Melvin J. Malone, Chairman**

---

**No. M2000-02924-COA-R12-CV - Filed June 7, 2002**

---

Discount Communications, Inc. purchases telephone services from BellSouth Telecommunications, Inc. and resells the services at an increased rate to Discount's own residential and commercial customers. Some of Discount's customers qualify for a Federal Communication Commission program called Lifeline, which provides telephone services at a reduced rate through federal and state subsidies. BellSouth and Discount got into a dispute about whether their agreement required BellSouth (1) to provide directory assistance to Discount's customers and (2) to pass the $3.50 per month state subsidy through to Discount. The Tennessee Regulatory Authority decided that the agreement required BellSouth to provide directory assistance at no charge to Discount's customers and that BellSouth was not required to forward the $3.50 monthly charge to Discount. We affirm.

**Tenn. R. App. P. 12 Appeal as of Right; Judgment of the Tennessee Regulatory**
**Commission Affirmed and Remanded**

BEN H. CANTRELL, P.J., M.S., delivered the opinion of the court, in which WILLIAM B. CAIN, J. and JANE W. WHEATCRAFT, SP. J., joined.

Henry Walker, Nashville, Tennessee, for the appellant, Discount Communications, Inc.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; and Vance L. Broemel, Assistant Attorney General, for the appellant, State of Tennessee.

Guy M. Hicks and Patrick W. Turner, Nashville, Tennessee, for the appellant and appellee, BellSouth Telecommunications, Inc.

Jonathan N. Wike and Gary R. Hotvedt, Nashville, Tennessee, for the appellee, Tennessee Regulatory Authority.

# OPINION

## I.

The Federal Communications Act of 1996 requires local exchange carriers like BellSouth Communications, Inc. ("BellSouth") to sell its services at wholesale rates to subscribers, who may resell the services to their own customers. *See* 47 U.S.C. § 251(c)(4). In the absence of an agreement about the wholesale price for services, the Tennessee Regulatory Authority ("TRA") sets the wholesale rate at the regular retail rate less any marketing, billing, collection, and other costs that will be avoided by BellSouth, (the "avoided costs"). *See* 47 U.S.C. § 252(d)(3). In a prior proceeding the TRA set the wholesale rate at 16% off the regular retail rate. In another proceeding, involving resellers that provide their own directory assistance, the TRA set the discount at 21.56%.

Lifeline is a federally certified program designed to make telephone service more affordable for low income households. The federal government provides a subsidy of $7.00 a month for eligible consumers and the TRA requires each carrier in Tennessee to give a $3.50 credit as a state subsidy. It appears that ultimately the TRA intends to fund the state subsidy with a <u>Universal Service Fund</u> accumulated from surcharges on all carriers, but as of the date of the order below, the state portion of the total subsidy was exacted from the local carrier.

In 1998 Discount Communications, Inc. ("Discount") and BellSouth entered into a resale agreement. By March of 2000 the parties had reached an impasse on two important points: (1) Did the rate Discount pay include BellSouth's directory assistance services; and (2) Did the agreement require BellSouth to give Discount the $3.50 state subsidy. Pursuant to a provision in the contract, Discount filed a formal complaint before the TRA to resolve the dispute. The TRA ruled with Discount on the first question and against it on the second.

## II.
### STANDARD OF REVIEW

When reviewing a decision of the TRA, this court must follow the standard of review set out in Tenn. Code Ann. § 4-5-322(h):

> The [reviewing] court may affirm the decision of the agency or remand for further proceedings. The court may reverse or modify the decision if the rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions or decisions are:
>
> (1)    In violation of constitutional or statutory provisions;
> (2)    In excess of the statutory authority of the agency;
> (3)    Made upon unlawful procedure;
> (4)    Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or

(5)     Unsupported by evidence which is both substantial and material in the light of the entire record.

Our Supreme Court has held that an agency's findings "may not be reversed or modified unless arbitrary or capricious or characterized by an abuse, or clearly unwarranted exercise, of discretion and must stand if supported by substantial and material evidence." *CF Industries v. Tennessee Pub. Serv. Comm'n*, 599 S.W.2d 536, 540 (Tenn. 1980).

The interpretation of a statute, however, and the application of the law to the facts is a question of law to be decided by the court. *Sanifill v. Tennessee Solid Waste Disposal Control Board*, 907 S.W.2d 807 (Tenn. 1995). The interpretation of a written agreement is also a question of law that merits a de novo review on appeal. *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88 (Tenn. 1999).

### III. DIRECTORY ASSISTANCE

The Resale Agreement entered into by BellSouth and Discount provided that the services available for purchase by Discount would be charged according to a "Schedule A" attached to the agreement. Schedule A called for a 16% discount off the retail rate. A footnote to the schedule, however, reads as follows:

> The Wholesale Discount is set as a percentage off the tariffed rates. If OLEC (Discount) provides is (sic) own operator services and directory services, the discount shall be 21.56%.

BellSouth argues that another section of the agreement, interpreted with the ongoing proceedings before the TRA in mind, clearly shows that the parties agreed that Discount should pay for directory assistance. The section referred to is section I.C and it provides:

> The rates pursuant by which Discount Communications is to purchase services from BellSouth for resale shall be at a discount rate off of the retail rate for the telecommunications service. The discount rates shall be as set forth in Exhibit A, attached hereto and incorporated herein by this reference. Such discount shall reflect the costs avoided by BellSouth when selling a service for wholesale purposes.

BellSouth's argument is that the agreement plainly states that Discount shall pay for the services it purchases from BellSouth at a certain percentage off the retail rate. Since directory assistance was not part of the basic service under the price regulation statutes, it was an extra that could be purchased at the discounted rate.

The TRA, however, concluded that the agreement contained two discount rate options, one with directory assistance (16%), and one without it (21.56%). Since Discount was paying the basic rate less 16%, it was in fact entitled to directory assistance.

We agree with that interpretation of the contract. The discount percentages set out in the agreement were set in prior proceedings before the TRA. The 16% discount reflected the TRA's calculation of the costs avoided when BellSouth did not have to engage in marketing, billing, or collection because they were selling services at wholesale. In other proceedings involving AT&T and MCI the TRA concluded that BellSouth avoided 21.56% of its costs when directory assistance was unbundled from the basic services. Therefore the TRA's interpretation seems like the only logical one to be deduced from the facts.

BellSouth also argues that under price regulation they were allowed to set such rates as they deemed appropriate. *See* Tenn. Code Ann. § 65-5-208(a). Therefore, they argue that they could increase the rates for directory assistance without seeking any approval from the TRA. What they say is undoubtedly true, but any increase in the charge for directory assistance would simply be added to the cost of the whole bundle of services and the new total would then be discounted by 16%.

## IV. LIFELINE

The TRA reviewed the history of the Lifeline program, including its former proceedings involving resellers of telephone services, and concluded that the authority had consistently placed the burden of providing the state portion of the Lifeline subsidy on each individual reseller. The TRA found that that policy complied with state and federal law and was consistent with BellSouth's Lifeline tariff.

Discount argues that the TRA decision violates the clear federal mandate that telecommunications services be offered for resale at "wholesale rates"; i.e., retail rates charged to BellSouth's Lifeline subscribers less the avoided costs. *See* 47 U.S.C. § 251 (c)(4)(A); 47 U.S.C. §252(d)(3). Since BellSouth gives its Lifeline customers the $3.50 credit, they must be required to give the same credit to Discount.

We think, however, that the policy expressed in the federal acts is addressed in the 1997 Federal Communication Commission's ("FCC") Universal Service Order. In that order the FCC required certain companies (including BellSouth) to pass through to its reseller customers the federal portion of the Lifeline subsidy. BellSouth has complied with that directive. With respect to the state portion of the subsidy (if the state chose to participate) the order says:

> We see no reason at this time to intrude in the first instance on states' decisions about how to generate intrastate support for Lifeline. We do not currently prescribe the methods states must use to generate intrastate Lifeline support, nor does this Order contain any such prescriptions. Many methods exist, including competitively neutral surcharges on all carriers or the use of general revenues, that would not place the burden on any single group of carriers. We note, however, that states must meet the requirements of section 254(e) in providing equitable and non-discriminatory support for state universal service support mechanisms.

<u>Universal Service Order</u> § 361. Another paragraph of the order states "we are hopeful that states will take the steps required to ensure that low-income consumers can receive Lifeline service from resellers." *Id.* at § 370. We conclude that the FCC interpreted the federal law as allowing the states to determine how the state portion of the Lifeline subsidy will be generated. We defer to the expertise of the FCC in interpreting its governing statutes. *CF Industries v. Tennessee Pub. Serv. Comm'n*, 599 S.W.2d 536 (Tenn. 1980). Therefore, the TRA is free to continue its policy of placing the burden of the state subsidy on the carriers that sell the services to the Lifeline customers.

We affirm the order of the Tennessee Regulatory Authority and remand this cause for any further proceedings necessary. Tax the costs on appeal equally to Discount Communications, Inc. and BellSouth Telecommunications, Inc.

_____
BEN H. CANTRELL, PRESIDING JUDGE, M.S.